**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CRIMINAL ACTION NO. 08-51-DLB-CJS**

**UNITED STATES OF AMERICA**                                                          **PLAINTIFF**

**vs.**                              **MEMORANDUM OPINION & ORDER**

**SAM DROGANES**                                                                              **DEFENDANT**

*** *** *** ***

This matter is before the Court on the Magistrate Judge's Report and Recommendation ("R&R") (Doc. # 186) which addressed three pending motions in this matter: (1) Defendant's Objections to the United States' Preliminary Judgment of Forfeiture (Doc. # 103); (2) Defendant's Motion for Sanctions (Doc. # 119); and (3) the United States' Motion for Destruction of Property (Doc. # 142). The Magistrate Judge recommends that the Court sustain in part Defendant's Objections to the United States Preliminary Judgment as being overly broad, grant in part Defendant's Motion for Sanctions, and deny as moot the United States' Motion for Destruction of Property. Both parties have objected to the R&R (Docs. # 192, 193), and the parties have filed supplemental memoranda on the Magistrate Judge's recommendation that sanctions be imposed on the government. (Docs. # 196, 197).

The Court held oral argument on August 3, 2012 to consider the parties' objections to the R&R. Assistant United States Attorneys Candace Hill and Daniel Kinnicut appeared on behalf of the United States. Attorneys Gary Sergent, Bruce McClure, and Kathleen

Brinkman appeared on behalf of Defendant, who was present at the hearing. The proceedings were recorded by Official Court Reporter Lisa Wiesman. At the close of the hearing, the Court took the parties objections to the R&R and the pending motions under advisement.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. The Seizure

Defendant Sam Droganes is the sole owner of Premium Fireworks, Inc., located in Covington, Kentucky. Droganes is in the business of selling consumer fireworks, also known as 1.4G fireworks. Premium Fireworks has never been licensed to sell display fireworks, also known as 1.3G fireworks.

In June 2007, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and the Consumer Products Safety Commission ("CPSC") began investigating Premium Fireworks for unlawfully selling 1.3G fireworks. On June 27, 2007, an undercover CPSC agent purchased thousands of dollars worth of fireworks from Defendant, which consisted of thirteen different types of fireworks. Although marked as 1.4G (consumer) fireworks, all were ultimately found not to be 1.4G fireworks: twelve were 1.3G (display) fireworks and one was a prohibited explosive device. (Doc. # 181; Gov't Ex. 2).

---

[1] Subsections A and B of the Factual Background are adopted from the Magistrate Judge's findings of fact in her R&R. Each of the facts were established through testimony and evidence presented at a three-day evidentiary hearing conducted by the Magistrate Judge on August 29-31, 2011. During the August 3 oral argument, the Court asked the government and Defendant whether they objected to the Magistrate Judge's findings of fact. The government responded that it did not object to the Magistrate Judge's factual findings regarding the fireworks subject to forfeiture, but objected to the Magistrate Judge's finding that the government acted in bad faith. Although Defendant did not directly respond to the question, he presented no objections to the Magistrate Judge's factual findings. Ultimately, the parties have not objected to the Magistrate Judge's findings of fact contained in Subsection A or B herein. Accordingly, the Court will adopt the Magistrate Judge's findings. (*See* Doc. # 186, p. 1-12).

On July 2-3, 2007, ATF obtained and executed search warrants on the building where the Premium Fireworks store was located, two warehouses, Defendant's residence, and a 1997 Chevrolet box truck. Officer Fred Bradford, an ATF explosives enforcement officer, testified that he was involved in the execution of the search warrants in this matter and that ATF seized essentially all of Defendant's inventory.[2]

In July 2007, ATF learned from U.S. Customs personnel that Defendant was receiving multiple shipments of fireworks from outside the country. Based on this information and a viewing of these fireworks, ATF obtained seizure warrants for seven conex shipping containers that were being held by U.S. Customs. Officer Bradford was involved in the search of the conex containers and testified to a dangerous condition he observed involving flash powder in one of the conex containers. Agent Chard and Officer Bradford also testified that they observed moisture from condensation in some of the containers. Ultimately, ATF seized the fireworks in these conex containers, as well as the conex containers themselves.

In August 2007, ATF served seizure warrants for three additional conex containers containing fireworks. These containers were located at the Norfolk rail yard in Cincinnati, Ohio, and were destined for Premium Fireworks, Inc. (Doc. # 66-6). These fireworks and conex containers were also seized.

All of the seized fireworks, some 44 tractor trailer loads, were transported to Heritage Storage in Alda, Nebraska.

_____

[2] Defendant testified that the seizure also included his personal fireworks collection as well as fireworks purchased from a bankruptcy sale. Mr. David Browning testified that after twenty-five years of being in the fireworks business, his corporation went into bankruptcy. During the bankruptcy, his entire inventory of 1.4G fireworks was sold to Defendant in the trustee's public sale for $115,000. He testified that the sale did not include any 1.3G fireworks.

**B.     Testing and Segregation of Fireworks**

John Frederick, Heritage Storage's Chief of Security and Storage Manager, testified that in July 2007, he traveled to Kentucky to assist in preparing the fireworks for shipment to Heritage Storage.  As part of the process, Frederick inventoried all of the pallets being shipped, including the number of boxes on each pallet and its weight.

On August 22, 2007, Agent Chard sent two samples of the Red Coconut Rockets, removed from the conex containers at the rail yard, to the ATF laboratory for testing.  On December 12, 2007, Agent Chard sent a sample of each of the thirteen fireworks involved in the undercover purchase to the ATF laboratory for an analysis of whether they were 1.3G or 1.4G fireworks.  The ATF Explosives Technology Branch disassembled and weighed the samples and concluded that all thirteen samples exceeded the maximum weight permitted to be classified as a 1.4G firework.  (Doc. # 181; Gov't Ex. 2).  No classification was made on the Red Coconut Rockets.

On August 12, 2008, ATF selected 450 fireworks to be tested.  Frederick inventoried the  samples and then had them transported from Heritage Storage to Safety Consulting Engineers ("SCE") for testing.  Karl James Dahn, an engineer for SCE who has extensive experience with pyrotechnics and explosive matters, testified that he conducted the classification inspection on each of the 450 fireworks and then authored an October 26, 2008 report.  (Doc. # 181; Gov't Ex. 3).  Dahn used the American Pyrotechnic Association ("APA") and National Fire Protection Association's ("NFPA") guidelines in classifying the fireworks and not the more stringent standards found in the Code of Federal Regulations ("CFR").

Dahn testified that he prepared a data sheet on each firework inspected, which sheet contains the measurements and weight of each firework. He explained that to determine the total weight of a firework containing multiple shots, he would measure and weigh one shot and multiply that weight by the number of shots contained in the firework. For example, in inspecting the twenty-shot cake recorded on Government's Exhibit 17 (Doc. # 181), Dahn measured and weighed one of the twenty shots making up the cake. He did not weigh each of the twenty tubes separately.[3] To get the total weight of the firework, he added the calculated pyrotechnic weight to the weight of the propelling charge. After testing all 450 fireworks, he concluded that 187 were non-consumer fireworks under the APA standards. (*See* Doc. # 181; Gov't Ex. 3, table 4). On October 26, 2008, SCE submitted its report to ATF on the first 450 samples. (Doc. # 114-1). On November 6, 2008, Frederick went back to SCE to retrieve the samples, inventoried the items and shipped them back to Heritage.

In December 2008, ATF began the task of sorting the fireworks stored at Heritage Storage. Frederick testified that by early 2009, all of the fireworks were separated and classified as being either red (display), green (consumer), or orange (uncertain of classification). The fireworks were placed into bunkers, identified as red or green, based

---

[3] Defense experts Gene Baker and Roger Schneider both testified that to properly measure the weight of a firework with multiple shots, each shot must be disassembled and weighed because there can be differences in each tube. Mr. Schneider further explained that measuring one shot in a multi-shot cake is not a proper scientific method for determining classification because of the common use of dummy tubes for spacing and the fact that fireworks are handmade. Further, Mr. Schneider explained the CPSC would test multiple samples of one firework to determine compliance; CPSC usually demands that a minimum of eight to ten be tested.

on their classification.[4]  (Doc. # 181; Gov't Exs. 11, 12).  As part of this process, ATF unloaded the conex containers.  Officer Bradford was involved in the unloading of the conex containers and testified that the weather conditions were extreme, causing the moisture in the conex containers to freeze.  As a result, boxes were damaged and some were frozen together.[5]  (Doc. # 181; Gov't Exs. 5-8).  The agents moved the fireworks from the conex containers to the bunkers and returned the conex containers to their owner.  Ultimately there were twenty-nine bunkers of fireworks: seventeen bunkers contained red fireworks, and twelve bunkers contained the green and orange classified fireworks. (Doc. # 181; Def. Ex. QQ).

    After ATF completed its work at Heritage in January 2009, all of the water-damaged boxes were inventoried and moved to one bunker: Bunker Row 1-7.  Frederick testified there were fourteen pallets, a total of 204 boxes, of water-damaged items.  Frederick also testified that all of the water- damaged fireworks were classified as red, i.e., they were display fireworks.  Although Officer Bradford testified to several boxes being damaged by rodent infestation, Frederick was not aware of any rodent damage to the actual fireworks.  In a letter regarding the January 2009 manipulation, Heritage's vice president reported that there were seventy-six boxes of fireworks that had either packaging or product damage

---

[4] The fireworks were first separated into less than ten bunkers.  In early 2009, the number of bunkers increased to fifteen based upon the unloading of the conex containers.  In March 2009, ATF informed Heritage Storage that for safety concerns, the fireworks needed to be rearranged so that they were stacked only five boxes high and had space between the pallets.  After the manipulation, twenty-nine bunkers were required to store all of the fireworks.

[5] The vice president of Heritage, Mark Vess, prepared a report regarding its manipulation of fireworks during December 2008 to January 2009, and explained that approximately six percent of the material in the containers was visibly unuseable due to its deteriorated condition.  (Doc. # 181; Def. Ex. LL).  At the hearing, Agent Chard testified that he thought less than ten percent of the boxes in the conex containers were damaged.

caused by field mice. (Doc. # 181; Def. Ex. LL, at 3).

In or about January 2009, Officer Bradford also conducted testing on approximately seventy fireworks. As part of his inspection, he disassembled each firework, weighed the chemical composition of one shot and multiplied it by the number of shots in the firework to obtain a total weight, determined whether the sample contained any prohibited components, and then analyzed whether the firework qualified as a consumer or display grade firework under the APA standards. This process culminated in a report dated March 17, 2009. (Doc. # 181; Gov't Ex. 10). Thirty of the seventy fireworks tested were 1.4G fireworks and forty were found to be display fireworks. Officer Bradford testified that he gave Defendant the benefit of the doubt in determining the weight of the chemical composition of a given firework. He testified that in instances where the explosive material was mixed with nonexplosive materials, he cut the weight in half since he could not separate the materials.

In February 2009, Frederick took a second batch of 521 fireworks to SCE for a classification inspection. While the inspection process for the second batch was the same used in the first batch, the second report by SCE contained more detail. Dahn testified that for multi-shot fireworks, he again multiplied the weight calculation he obtained for one shot by the number of shots in the firework and added it to the weight of the propelling charge to obtain the total weight of the firework. He issued a draft report on March 13, 2009, which report evidences that, based upon the APA standards, 340 of the 521 firework samples inspected during this testing were display fireworks. (Doc. # 181; Gov't Ex. 4).

On March 11, 2009, the Government notified Defendant that the CFR standards would be applied in this criminal prosecution, not the less stringent APA standards used

in Dahn's and Bradford's reports.  (*See* Doc. # 119-1).  Also on March 11, 2009, the United States sent Defendant "a list of items that have been determined to be 1.4G (consumer) fireworks," which list was being "provided pursuant to the Court's February 19, 2009 order." (Doc. # 119-1).  Sometime after receiving Dahn's March 13, 2009, report (Doc. # 181; Gov't Ex. 4), Agent Chard and Officer Bradford used the data sheets from testing to reclassify the fireworks under the CFR standards.

From August 18, 2009 until October 16, 2009, Heritage and ATF personnel worked together to complete a physical inventory of all of the fireworks.  (Doc. # 181; Gov't Exs. 11, 12).  During this process the fireworks were counted, weighed and each type was photographed.  (Doc. # 181; Def. Ex. SS).  According to Agent Chard's testimony, utilizing the final physical inventory lists and the CFR standards, there were approximately 862 different types of fireworks[6] that were classified as 1.3G fireworks (Doc. # 181; Gov't Ex. 11) and 366 types of fireworks that were classified as either green or orange. (Doc. # 181; Gov't Ex. 12).  Fireworks classified as 1.3G fireworks are listed on what has come to be known as the "Red List," a list produced by the government at the evidentiary hearing (Doc. # 181, Gov't Ex. 11).  Similarly, fireworks classified as 1.4G fireworks are listed on what has come to be known as the "Green List," and unclassified fireworks are listed on the "Orange List."  (Doc. # 181, Gov't Ex. 12).

## C.   The Criminal Case

On July 10, 2008, Droganes was indicted in a six-count indictment charging him with

---

[6] Chard initially testified to this 862 number, although on recross-examination he acknowledged that some of the numbers on the consecutively-numbered list were missing.  Hence, the 862 different types is an approximation.

engaging in the business of importing, manufacturing, transporting and distributing explosive material without an ATF license and forfeiture.[7]  (Doc. # 1).  On October 7, 2008, Droganes filed a Motion for Return of Property pursuant to Federal Rule Criminal Procedure 41(g), seeking the return of the lawful 1.4G fireworks.  (Doc. # 17).  After the motion was fully briefed and arguments were heard, Magistrate Judge Wehrman issued a Report and Recommendation recommending that the undersigned order the United States to complete its testing and provide Defendant with a list of 1.4G fireworks, along with a timetable for their return, within thirty days.  (Doc. # 36).  The District Judge adopted the R&R, but provided the United States until March 11, 2009, to complete its testing, including segregating the 1.3G and 1.4G fireworks, and provide an inventory list of the legal 1.4G fireworks and a timetable for their return.  (Doc. # 44).

As previously discussed herein, pursuant to the District Court's Order, an AUSA on March 11, 2009, sent a letter to defense counsel containing a list compiled by ATF of the purported 1.4G fireworks being stored at Heritage.  (Doc. # 119-1).  And as previously noted, that letter also informed that ATF believed that all of the fireworks stored at Heritage Storage were unfit to be transported back into interstate commerce, but that ATF would agree to compensate Defendant the wholesale price for the legal fireworks.  (*Id.*).

On July 31, 2009, Defendant pled guilty to Count Five of the Superseding Indictment, charging him with distributing explosives without a license.  He also agreed to forfeit the "items listed in Count Six of the Superseding Indictment that have been determined by ATF to be display fireworks."  (Doc. # 105, at 4).  On March 23, 2010, the

---

[7] On January 8, 2009, a superseding indictment was filed, but no new charges were added.  (Doc. # 31).

United States gave notice of the filing of its Preliminary Judgment of Forfeiture, to which Defendant filed Objections. (Docs. # 95, 103). On April 7, 2010, Defendant was sentenced to a split sentence of four months of incarceration to be followed by four months of home confinement. (Doc. # 107).

After Sentencing, the Court addressed forfeiture with counsel and instructed Defendant to file supplemental objections indicating why certain fireworks on the Government's exhibit to the Preliminary Judgment of Forfeiture were not subject to forfeiture. The Government was given ten days to respond to the supplemental objections. (Doc. # 116). The parties filings were made on April 27, 2010, and May 3, 2010, respectively. (Docs. # 112, 114).

On January 4, 2010, the ATF notified Defendant by letter that it would not compensate him for the consumer fireworks. (Doc. # 119-6). The ATF justified its refusal by claiming that the "detention of goods" exception to the government's waiver of sovereign immunity in th Federal Torts Claims Act "precludes any claim based on the failure of law enforcement to return detained property or arising out of negligent handling or storage of property seized not solely for forfeiture purposes." After that letter, there were no further discussions about compensating Defendant for the 1.4G fireworks. Consequently, on July 8, 2010, Defendant filed a Motion for Sanctions for the Government's failure to timely return or otherwise provide compensation for the consumer fireworks.

On January 14, 2011, the Government filed a Motion for Destruction of Property, arguing the fireworks had deteriorated to such a degree that they could not be returned to Defendant. (Doc. # 142). In addition, the Government argued that the cost of storing the fireworks far exceeded their value and presented affidavits in support of their argument.

(Docs. # 142-1, 142-3, 142-6). The pending objections/motions were referred to the Magistrate Judge for Report and Recommendation.

Magistrate Judge Smith rendered her R&R on May 18, 2012. She concluded that Defendant's objection to the proposed Preliminary Judgment of Forfeiture should be sustained in part as being overly broad. She found that the government proved by a preponderance of the evidence that all fireworks on the Red List (Doc. # 181; Gov't Ex. 11) are 1.3G fireworks subject to forfeiture. Therefore, she recommends that the government be ordered to file an amended proposed Preliminary Judgment of Forfeiture that identifies the fireworks subject to forfeiture as those identified on the Red List. She also recommends that the undersigned order the government to return all fireworks on the Green and Orange lists.

Additionally, Magistrate Judge Smith recommends the Court impose sanctions against the government under its inherent power. The Magistrate Judge concluded that the government's noncompliance with this Court's Order to complete testing, provide Defendant with a list of 1.4G fireworks and a timetable for their return not later than March 11, 2009 was done in bad faith. She also concluded that the government's representations that the fireworks were damaged, and the government's continued refusal to return legal 1.4G fireworks were done in bad faith.

Defendant and the government have each objected to the R&R (Docs. # 192, 193). Defendant objects to the Magistrate Judge's conclusion that all fireworks on the Red List are subject to forfeiture, and argues that he should be given additional time to independently test those fireworks the government has determined to be 1.3G fireworks. The government agrees with the Magistrate Judge's conclusions concerning the fireworks

subject to forfeiture, but objects to the Magistrate Judge's recommendation that sanctions be imposed on the government. Each objection will be addressed in turn.

## II. ANALYSIS

### A. Defendant's Objection to the United States' proposed Preliminary Judgment of Forfeiture (Doc. # 103)

Defendant originally objected to the language in the United States' proposed Preliminary Judgment of Forfeiture as "void for vagueness, unenforceable and [because it] usurps the judicial authority of the court in this case." (Doc. # 103). The proposed Preliminary Judgment of Forfeiture stated that "[a]ll fireworks listed in Count 6 of the Superseding Indictment that ATF has deemed to be display fireworks" are "hereby condemned and forfeited to the United States of America pursuant to Title 18, United States Code, Section 844(c)(1)." (Doc. # 95-1). The United States presumably proposed this language because it mirrored the forfeiture provision Defendant agreed to in his plea agreement, which stated "Defendant will forfeit to the United States any and all interest in the items listed in Count 6 of the Superseding Indictment that have been determined by ATF to be display fireworks . . . ." (Doc. # 105).

In her R&R, Magistrate Judge Smith concluded that the language of the proposed Preliminary Judgment of Forfeiture was overly broad and, thus, recommends that Defendant's objection be sustained in part. The Magistrate Judge also concluded that "[t]he evidence presented at the evidentiary hearing . . . supports a finding that the Government has established by a preponderance of the evidence that the fireworks contained on the red list (Doc. # 181, Ex. 11) are 1.3G fireworks and are subject to forfeiture under 18 U.S.C. § 844(c)(1) as explosive materials intended to be used in

violation of the provisions of § 842." (Doc. # 186, p. 16).   Furthermore, the Magistrate Judge found that the fireworks on the Green and Orange Lists (Doc. # 181, Gov't Ex. 12) are 1.4G fireworks and not subject to forfeiture.   Therefore, the Magistrate Judge recommends that the Government be ordered to tender a new proposed Preliminary Judgment of Forfeiture that specifically identifies the fireworks on the Red List (Doc. # 181, Gov't Ex. 11) as being subject to forfeiture.   She also recommends that the government be ordered to return all fireworks on the Green and Orange Lists, at the government's expense.

### 1.   Those items recently determined to be 1.3G fireworks by ATF (Doc. # 199-3) are subject to forfeiture

Despite the recommendation that all fireworks on the Orange List be returned, the ATF conducted further testing on those fireworks at the direction of the Assistant United States Attorney.   Neither the Court nor Defendant were aware of this additional testing until the August 3, 2012 oral argument.   After the oral argument, the government submitted a letter from Carl Vasilko, the Director of the National Center for Explosives Training and Research, explaining that ATF tested each of the fireworks on the Orange List "using the same protocol as they had during their examination of other items related to this investigation." (Doc. # 199-1).   Based on the additional testing, the ATF produced a new list classifying each of the fireworks on the original Orange List as either 1.3G or 1.4G fireworks.   (Doc. # 199-2) (hereinafter referred to as the "amended Orange List").   The ATF found that 44 categories of fireworks on the original Orange List are 1.3G fireworks and 13 categories of fireworks are 1.4G fireworks.   (*See* Doc. # 199-1).   Additionally, the ATF concluded that 27 items on the original Orange List were destroyed during previous testing

and cannot be returned. (*See id.*).

Although Defendant has not had an opportunity to challenge the ATF's most recent testing, the Court finds by a preponderance of the evidence that the fireworks recently identified as 1.3G fireworks are, in fact, 1.3G fireworks. The ATF tested each of those fireworks using the same protocol it used to test other fireworks in this case. Despite Defendant's general concerns about the ATF's testing methods, the Magistrate Judge concluded that these protocols produced reliable results. As explained in more detail below, the undersigned agrees with the Magistrate Judge's conclusion. Therefore, any fireworks identified as 1.3G fireworks on the recently amended Orange List (Doc. # 199-3) are subject to forfeiture.

Additionally, the 27 items that were destroyed during previous testing shall also be forfeited. As the ATF explains, each of these items consisted of only one single piece of product that had previously been examined by a private contractor. That contractor was unable to definitively classify those 27 items as either 1.3G or 1.4G fireworks. However, after the contractor tested the items, the items were destroyed and, therefore, can neither be returned nor forfeited.

### 2. Defendant's Objections to Magistrate Judge Smith's Recommended Adjudication of the objections to the United States' Proposed Preliminary Judgment of Forfeiture

Defendant now objects to the Magistrate Judge's recommended adjudication of his objections to the United States' proposed Preliminary Judgment of Forfeiture. Although Defendant has labeled four separate arguments, he has essentially set forth two arguments for the Court's consideration. First, Defendant asserts that once the government produces a final Red List identifying all allegedly illegal fireworks, he should be given the opportunity

to test fireworks he purchased at public sale that are on that list. Second, Defendant asserts that any 1.3G fireworks included in his personal collection are not subject to forfeiture because they were never intended to be sold or available for sale. Thus, Defendant contends they are not within the scope of the Indictment.

At oral argument, the government contended that each of Defendant's objections should be precluded by the terms of his plea agreement. In paragraph ten of Defendant's plea agreement, Defendant agreed to "forfeit to the United States any and all interest in the items listed in Count 6 of the Superseding Indictment *that have been determined by ATF to be display [1.3G] fireworks . . . ."* (Doc. # 105) (emphasis added). Count 6 listed each of the twelve 1.3G fireworks Defendant sold to the undercover agent on June 27, 2007 as well as all other fireworks seized from Defendant. The government argued that Defendant agreed to forfeit all of these fireworks to the extent that they were determined to be 1.3G fireworks by the ATF. The Court agrees for the following reasons.

The Supreme Court has upheld a district court's Judgment of Forfeiture where the Judgment was consistent with a forfeiture provision within the defendant's plea agreement. In *Libretti*, the Supreme Court considered whether a district court's forfeiture order must be set aside because the court neglected to establish a factual basis for forfeiture of the property covered by the order pursuant to Federal Rule of Criminal Procedure 11(f).[8] *Id.* at 37. The Court held that Rule 11(f) only required district courts to establish a factual basis for the defendant's admission of guilt to a substantive criminal offense. *Id.* Forfeiture, according to the Supreme Court, "is an element of the sentence imposed *following*

_____

[8] The text of Federal Rule of Criminal Procedure 11(f) as considered by the *Libretti* Court was moved to Rule 11(b)(3) as part of the 2002 revision to the Federal Rules of Criminal Procedure.

conviction . . . and thus falls outside the scope of Rule 11(f)."  *Id.* at 38-39.  As such, a district court may accept a defendant's agreement to forfeit assets so long as the defendant entered the agreement knowingly and voluntarily.  *Id.* at 42.

Pursuant to *Libretti*, the forfeiture provision in Defendant's plea agreement is enforceable because it was entered knowingly and voluntarily.  At Defendant's rearraignment, the Court advised Defendant that by pleading guilty to Count 5 of the Superseding Indictment, he would be admitting his guilt to a felony offense.  (Doc. # 77, at 7).  The Court also ensured that the plea agreement encompassed the entire agreement between Defendant and the government, and that no other promises or assurances had been made to Defendant.  (*Id.* at 9).  In addition, Defendant stated that no one had forced or threatened him to enter his guilty plea.  (*Id.*).

After ensuring that Defendant was voluntarily entering a guilty plea, the Court asked the Assistant United States Attorney ("AUSA") to give a summary of the written plea agreement.  (*Id.*).  As part of this oral summary, the AUSA stated that "defendant agrees to forfeit to the United States any and all interest in the items listed in Count 6 of the superseding indictment that have been determined by ATF to be display fireworks, and he agrees to execute any documents necessary for this forfeiture, whether it's judicial or administrative."  (*Id.* at 11).  At the conclusion of the summary, Defendant verified that the summary was accurate and consistent with his understanding of the plea agreement.

The Court also specifically addressed the forfeiture provision with Defendant during the rearraignment.  The Court stated:

> Well, Mr. Droganes, if something is determined to have been a display firework, you understand that this plea agreement requires that you forfeit, whether it be judicial or administrative, any interest you have in those items?

That's a negotiated term of this plea agreement. Do you understand that?

(*Id.* at 12). Defendant responded, "Yes, sir, I do."

At the conclusion of the rearraignment, the Court found that Defendant was competent and capable of entering an informed plea, and that Defendant was aware of the nature of the charge in Count 5 and the consequences of the plea. (Doc. # 77, at 30). The court also found that Defendant's plea of guilty to Count 5 was knowing and voluntary, and supported by an independent basis in fact. (*Id.*) As a result, the Court accepted Defendant's plea and adjudged Defendant guilty of Count 5. (*Id.*).

Defendant is now bound by the terms of his plea agreement. *See United States v. Luske*, 286 F.3d 906, 909 (6th Cir. 2002) (holding that plea agreements are contractual in nature and, thus, enforceable pursuant to traditional principles of contract law). The scope of Defendant's agreement is a question of fact for this Court to determine. *Id.* Having reviewed Defendant's plea agreement, the Court finds that Defendant agreed to be bound by the ATF's determination on which fireworks are 1.3G. Defendant also agreed to forfeit all fireworks listed in Count 6 of the Superseding Indictment that were determined to be 1.3G fireworks. With this agreement in mind, the Court will turn to each of Defendant's specific objections.

**a.     Defendant argues he should *now* be permitted to test fireworks on the government's Red List**

On objection to the R&R, Defendant contends that he should *now* be entitled to test those fireworks he purchased at public sale that the government has identified as 1.3G fireworks. However, as explained above, Defendant agreed to forfeit all fireworks that ATF determined to be 1.3G fireworks. As a term of his plea agreement, Defendant negotiated

away the right to independently test and confirm the ATF's findings. Defendant's agreement aside, Defendant has not set forth a reason that justifies further testing at this juncture.

Assuming, *arguendo*, that Defendant did not agree to be bound by the ATF's determination, the Court will address each of the four reasons Defendant's offers in support of his request to test the 1.3G fireworks. First, Defendant argues that it is illogical to conclude that any of the fireworks he purchased at public sale are 1.3G fireworks. Instead, Defendant suggests that the Court should *presume* the fireworks are legal for two reasons. First, the fireworks were purchased from a bankruptcy trustee who was selling the inventory of a bankrupt firework distribution business. The owner of that business, David Browning, testified at the evidentiary hearing that he only sold 1.4G fireworks. Second, Defendant argues "there is also a presumption that the trustee had independently verified that the products that he was entrusted to sell at public auction were legal 1.4G fireworks." (Doc. # 193, at 2).

However, the Magistrate Judge appropriately considered this argument in her R&R, when she stated:

> Defendant also argued in his Objections that a significant number of fireworks identified as 1.3G by the Government are 1.4G as evidenced by the fact they were either manufactured by companies that do not manufacture 1.3G fireworks or were purchased from a bankruptcy sale that included only 1.4G fireworks . . . This argument that all items labeled as 1.4G and/or that were sold by the bankruptcy court are presumptively legal 1.4G fireworks is unpersuasive and therefore rejected. The Government has presented evidence of laboratory testing supporting its position that the labels were unreliable, as many fireworks were overloaded. The Government also demonstrated that the fireworks were classified as 1.3G were classified as such, despite their labels, only after testing revealed they exceeded the weight permitted to be classified as 1.4G.

(Doc. # 186, at 17).

The testimony at the evidentiary hearing supports the Magistrate Judge's conclusion that Defendant is not entitled to a presumption that the fireworks purchased at public sale were 1.4G fireworks. Mr. David Browning, the owner of the bankrupt corporation, testified that "[his business] imported and wholesaled consumer 1.4G fireworks." (Doc. # 190, at 207). He also verified that his inventory was sold to Defendant at a public sale by the bankruptcy trustee. However, aside from stating the he only imported and sold consumer 1.4G fireworks, Mr. Browning offered absolutely no testimony to objectively prove the fireworks in his inventory were actually 1.4G fireworks. Therefore, Mr. Browning's statements do not entitle Defendant to a presumption that the fireworks he purchased at public sale were 1.4G.

Defendant's argument that the Court should assume the bankruptcy trustee tested the fireworks before selling them to ensure they were 1.4G is likewise unavailing. Specifically, Defendant contends that "[i]t is illogical to find that the trustee would sell at public auction 1.3G fireworks to Defendant, if only because doing so would be illegal . . . [T]he trustee is prohibited from selling any 1.3G fireworks to a person who does not hold a valid federal explosives license." (Doc. # 192, at 2). It is certainly true that it would be illegal for the trustee to sell 1.3G fireworks to a person who does not hold the appropriate license. However, Defendant has offered no reason why the Court should presume the trustee engaged in lawful behavior. If Defendant wished to rely on this argument, he had the opportunity to call the trustee as a witness during the evidentiary hearing to establish that the trustee tested the fireworks. Without any evidence of record to show the trustee tested the fireworks, Defendant is simply not entitled to the presumption that the trustee

19

only sold 1.4G fireworks.

Defendant also argues he should now be permitted to test the fireworks the Government has deemed 1.3G fireworks because the government experts' method of testing the fireworks was unreliable and produced inaccurate measurements. According to Defendant, the government's experts "crudely multiplied the number of tubes by the weight assigned to the one, and only, tube actually tested" and did not weigh each of the tubes separately, which "call[s] into doubt the precision and accuracy of the results." (Doc. # 192, at 8). However, as explained above, Defendant agreed in his plea agreement to be bound by the ATF's determination on which fireworks are 1.3G fireworks. Thus, he cannot now challenge the ATF's determination.

Moreover, Defendant also presented this argument to the Magistrate Judge, who rejected the contention on its merits. In her R&R, the Magistrate Judge detailed the government experts' testing methodology (*See* Doc. # 198, p. 4) and then stated:

> In addition, although Defendant's experts testified that analyzing only one shot of a multi-shot cake and multiplying it by the number of shots in a device was an inaccurate method for determining the pyrotechnic weight of a device, they could not point to a single sample where the methodology produced an inaccurate measurement. Nor did any of Defendant's experts conduct any testing of their own. In addition, Officer Bradford testified that in conducting the testing, he and SCE followed ATF's accepted protocol. Bradford further testified that he did not observe any dummy cylinder in any of the fireworks he tested.

(*Id.* at 16-17).

As the Magistrate Judge accurately explained, while Defendant's expert, Eugene Baker, expressed general doubt on the reliability of the government experts' methodology, he offered no direct evidence that the methodology produced inaccurate results. For example, on redirect examination, defense counsel attempted to clarify the unreliability of

the government experts' methodology of weighing one tube within a firework and then multiplying that weight by the total number of tubes to arrive at a total weight of the pyrotechnic charge. Defense counsel asked Mr. Baker, "Would all of the powder components in each tube be the same if each tube has a different effect?" (Doc. # 191, at 36). Mr. Baker replied, "[t]here's no way to know what the weights were on each individual tube." (*Id.*). Although this line of questioning cast doubt on the reliability of the methodology, it simply did not show that the methodology produced inaccurate results. Because the Magistrate Judge adequately and accurately considered this objection in her R&R, the Court finds no reason why Defendant is entitled to additional testing based on this objection.

Defendant offers a third reason why he should now be permitted to test the fireworks the government has classified as 1.3G. According to Defendant, in the interest of financial prudence and expedience, he should only be required to test the fireworks after the government produces a final Red List identifying which fireworks it deems as 1.3G. However, Defendant has had ample opportunity to test the fireworks in this case. Although the government has recently identified forty-four (44) additional types of fireworks as 1.3G fireworks (*See* Doc. # 199-3), Defendant has known since his sentencing that the government classified over 860 other types of seized fireworks as 1.3G. The government's "Red List," identifying approximately 862 types of fireworks as 1.3G, was originally admitted as an exhibit at Defendant's sentencing on April 7, 2010. (Doc. # 108). The government submitted the same Red List as an exhibit during the three-day evidentiary hearing held on August 29-31, 2011. (Doc. # 181, Ex. 11). In fact, when authenticating the exhibit during the evidentiary hearing, the AUSA stated to the witness, "I'm going to show you what has

been . . . marked as Government's Exhibit, for this purpose here, 11. It was previously marked as Government's Exhibit Number 1 at the sentencing hearing on April 7th of 2010 under document number 108." (Doc. # 189, at 54). As a result, Defendant knew about approximately 95% of the fireworks the government classified as 1.3G for at least a year before the evidentiary hearing.

If Defendant wanted to test fireworks only after the government identified allegedly 1.3G fireworks, he had the opportunity to conduct that testing before the evidentiary hearing. Instead, Defendant has waited until after the Magistrate Judge conducted a three-day evidentiary hearing and rendered her R&R to argue that he should now be permitted to conduct his own testing. Simply put, Defendant's argument does not explain why he failed to test the fireworks on the Red List, admitted as an exhibit during his sentencing, long ago. Defendant has had ample opportunity to test the fireworks, and the Court will not allow him to begin testing at this juncture.

Defendant's third argument merits one final comment. Defendant seems to believe that this matter was referred to the Magistrate Judge to make an initial determination on whether the government could prove by a preponderance of the evidence that the fireworks on the Red List were subject to forfeiture. If the Magistrate Judge concluded the Red List accurately identified illegal fireworks, Defendant seems to suggest he should have an opportunity to refute that finding before the undersigned by presenting additional evidence. Defendant's understanding of the purpose of referring this matter to the Magistrate Judge, however, is mistaken.

This matter was referred to the Magistrate Judge to make a recommendation on the *ultimate* adjudication, and not on whether the government met an *initial* burden of proof that

the seized property was subject to criminal forfeiture. Moreover, this is not a burden shifting case. Instead, the government has the burden to prove by a preponderance of the evidence that the seized fireworks are subject to forfeiture. *See United States v. Warshak*, 631 F.3d 266, 331 (6th Cir. 2010); *United States v. Jones*, 502 F.3d 388, 391 (6th Cir. 2007); *United States v. Hall*, 441 F.3d 651, 654 (6th Cir. 2005). If the Defendant wished to challenge that the government had not met its burden, he should have presented contrary evidence at the evidentiary hearing, which he certainly had time to develop. Accordingly, Defendant's third argument as to why he should now be permitted to test fireworks is not well taken.

Defendant's fourth and final argument as to why he should now be permitted to test fireworks was not presented to the Magistrate Judge and, thus, not discussed in her R&R. Defendant suggests he is contemplating pursuing a civil action against the bankruptcy trustee for selling 1.3G fireworks under the guise that the fireworks were 1.4G fireworks. Anticipating that litigation, Defendant argues he must be given the opportunity to more stringently test the fireworks he purchased at the public sale in order to develop necessary evidence for that lawsuit. Defendant asserts that if he is denied the opportunity to test the fireworks, or if they are destroyed before that litigation, he may be subject to a spoliation of evidence defense.

The Court, however, is not inclined to require that the fireworks continue to be preserved in anticipation of potential litigation against the bankruptcy trustee. Defendant has cited to no authority for the proposition that a Court must preserve property subject to forfeiture if that property will potentially be admitted as evidence in a yet-to-be-filed civil case. Ultimately, this Court must decide the matters pending in this case, and not forecast

23

issues that might arise in a hypothetical lawsuit. Therefore, the Court will not permit Defendant to conduct additional testing on any 1.3G fireworks purchased at public sale, nor require that they be preserved, in anticipation of future civil litigation.

In the end, the government has proven by a preponderance of the evidence that the fireworks on the Red List (Doc. # 181, Gov't Ex. 11) and those identified as 1.3G fireworks on the recently amended Orange List (Doc. # 199-3) are, in fact, 1.3G fireworks subject to forfeiture pursuant to 18 U.S.C. § 844(c)(1) and paragraph 10 of Defendant's plea agreement.

### b.    Defendant's Personal Collection

Defendant is also "especially interested in recovering the fireworks that he maintained as his personal collection." (Doc. # 192, at 10). The Magistrate Judge concluded that Defendant's personal collection was subject to forfeiture. Although Defendant does not specifically object to the Magistrate Judge's findings regarding these fireworks, Defendant argues that "none of [the fireworks in his personal collection] were ever intended, or even available for sale; therefore at all times relevant, the disposition of these fireworks is outside the scope of the criminal indictment." (*Id.*). By this argument, Defendant contends that the government failed to establish the requisite nexus between his personal collection of fireworks and the offense of conviction in accordance with Federal Rule of Criminal Procedure 32.2(b)(1)(A) and 18 U.S.C. § 844(c)(1), and the Magistrate Judge erred in finding to the contrary.

At oral argument, Defense counsel elaborated on this argument. Counsel suggested that, pursuant to 18 U.S.C. § 844(c)(1), Defendant is only required to criminally forfeit those fireworks he sold to an undercover agent on June 27, 2007. Defendant pled guilty to Count

24

5 of the Superseding Indictment and agreed that the government could prove beyond a reasonable doubt that he sold "a quantity of fireworks" from his store to an undercover agent on or about June 27, 2007. (Doc. # 105). Defendant also agreed that "subsequent testing confirmed that all but one of the items were 1.3G (display) fireworks," and that he did not have a license or permit from ATF to distribute display fireworks. (*Id.*). Combining Defendant's written objection and his counsel's argument at oral argument, Defendant apparently argues that his personal collection was not involved in the June 27, 2007 sale and he did not otherwise intend to sale those fireworks. Therefore, Defendant contends the fireworks are not subject to forfeiture.

Defendant's argument is misplaced. As the Court has already held, Defendant agreed to forfeit *all* 1.3G fireworks listed in Count 6 of the Superseding Indictment. Count 6 listed each of the fireworks involved in the June 27, 2007 sale as well as all other fireworks seized from Defendant, including those seized from his warehouse on Decoursey Pike in Taylor Mill, Kentucky. Defendant has admitted that his personal collection was stored at his warehouse on Decoursey Pike and was seized by the government. As such, Defendant has agreed to forfeit his personal collection to the extent it includes 1.3G fireworks and the Court may enforce Defendant's plea agreement to forfeit those fireworks. *See Libretti*, 516 U.S. at 38-42.

### 3. The United States' "Objection" to Magistrate Judge Smith's Recommended Adjudication of the objections to the United States' Proposed Preliminary Judgment of Forfeiture

The United States originally objected to returning those fireworks on the Green List because ATF has serious concern about the safety and stability of those fireworks. Specifically, the United States asserted that it will "conditionally agree" to return the

fireworks if the Court requires Defendant to enter a "hold harmless" or indemnity agreement with the United States. However, at oral argument, the government withdrew this objection and agreed to return those fireworks on the Green List (Doc. # 181, Gov't Ex. 12). Therefore, this objection will be overruled as withdrawn.

**B.    Defendant's Motion for Sanctions**

Three months after he was sentenced, Defendant moved the Court to impose sanctions on the ATF. (Doc. # 119). Specifically, Defendant requested that the Court require ATF to reimburse him for the retail value of 1.4G fireworks that ATF refused to return, pay the rental costs of the conex containers that accrued while the containers were in the government's custody, and pay Defendant "the attorney fees and expenses that he incurred to secure the return of the consumer fireworks or reimbursement for their value, including the time and expense related to prosecuting this motion." (Doc. # 119, at 1).

In his motion, Defendant details numerous examples of bad-faith conduct on the part of the ATF . Among the examples, Defendant states that "ATF refuses to return the consumer fireworks and refuses to reimburse [him] for them" in direct disobeyance of this Court's orders. Similarly, Defendant argues that the ATF failed to compensate him for the fireworks in conformity with a letter sent by an Assistant United States Attorney on March 11, 2009 to defense counsel stating that "ATF agreed to compensate your client for the wholesale price of those items that should be returned to him." Instead, after repeated attempts by defense counsel to collect the money as promised, the ATF sent Defendant a letter on January 4, 2010 refusing to compensate him for the fireworks. Based on these actions and others, Defendant argues that the Court should impose sanctions against the ATF.

In her R&R, the Magistrate Judge stated that "the parties agree that the Court has the power to sanction a party for violating its orders under both its civil contempt power and the Court's inherent authority to enforce its own orders." (Doc. # 186, at 21). The Magistrate Judge then concluded that the government acted in bad faith in failing to comply with the undersigned's Order to provide a complete list of 1.4G fireworks by March 11, 2009 (*see* Doc. # 44), and failing to return Defendant's lawful fireworks as ordered by the undersigned. (Doc. # 186, at 22). As a result of those findings, the Magistrate Judge recommends "as a sanction that, under the Court's inherent powers, the presiding District Judge order the Government to reimburse Defendant for expenses he incurred as a result of the Government's use of the conex containers during the eighteen months they sat at Heritage." (*Id.* at 29-30). The Magistrate Judge also recommends that "the Government be ordered to reimburse Defendant the expenses, including attorney fees, he incurred in seeking the return of his lawful property after May 11, 2009," presumably under the Court's inherent powers.

The government has asserted three objections to the Magistrate Judge's recommendations. First, the government argues that the Court cannot use its inherent powers to impose monetary sanctions in a criminal case. Second, even if the Court may use its inherent powers to impose monetary sanctions in a criminal case, sovereign immunity bars imposition of such sanctions against the United States. Finally, the government asserts that sanctions are not justified because evidence does not show that any government official acted in bad faith.

Defendant has responded that this is a civil proceeding, and during the August 3 hearing, used a lengthy PowerPoint presentation to illustrate why these proceedings are

civil and not criminal. Based on this characterization of the proceedings, Defendant argues the Court has the authority to sanction the government, and specifically ATF, under its inherent powers, its civil contempt power, and Federal Rule of Civil Procedure 11. Defendant also argues that the government has waived its sovereign immunity as to each of these sanctioning powers. Finally, Defendant has offered numerous examples of the government's allegedly bad-faith conduct in support of his contention that sanctions are justified.

Before addressing the government's particular objections, the Court must determine whether this is a civil or criminal proceeding. If this is a civil proceeding, the Court has the authority to sanction the government under Federal Rule of Civil Procedure 11 and, possibly, its inherent powers. However, if this is a criminal proceeding, the Federal Rules of Civil Procedure are inapplicable, and the Court will have to consider the government's argument that the Court cannot impose sanctions under its inherent authority in a criminal case.[9]

## 1.    Civil or Criminal Proceeding

Defendant has maintained that this is a civil proceeding, although his basis for that argument has evolved over time. In his Motion for Sanctions, Defendant acknowledged that this is the "forfeiture aspect of [his] criminal proceeding," but argued that the forfeiture proceeding was a civil proceeding. He argued that the forfeiture proceeding requires the government to prove "by a preponderance of the evidence that property shall be forfeited

---

[9]    Neither party has argued that the Court's authority to impose sanctions under 18 U.S.C. § 401 is limited to a particular proceeding. Therefore, regardless of how these proceedings are characterized, the Court will consider whether sanctions against the government are appropriate under 18 U.S.C. § 401.

to the government." (Doc. # 119, at 8). Moreover, Defendant asserted that this proceeding is governed by Federal Rule of Criminal Procedure 32.2, which incorporates provisions of the Federal Rules of Civil Procedure. (*Id.*). Therefore, Defendant suggests the "forfeiture aspect of a criminal prosecution . . . is a civil proceeding." (*Id.*).

In supplemental briefing, Defendant's basis for suggesting this is a civil proceeding began to change. He moved away from his original acknowledgment that this was the forfeiture aspect of his criminal proceeding, and instead argued that "these proceedings stand alone, separate and apart from the criminal proceedings." (Doc. # 196, at 10). Defendant contended that he has served his sentence and, therefore, "the decision in these proceedings can no longer be rolled into the sentence." (*Id.*). However, despite his attempt to isolate these proceedings from his criminal case, Defendant acknowledged that these proceedings were governed by Federal Rule of Criminal Procedure 32.2, stating, "[i]n these proceeding, Rule 32.2 allows the court to make its finding on the forfeitability of the fireworks using a civil standard . . . ." (*Id.* at 10-11).

At oral argument, Defendant asserted yet another reason why these proceedings should be characterized as civil. For the first time, Defendant argued that this is not a criminal forfeiture proceeding. According to Defendant, the government can only seek criminal forfeiture under 18 U.S.C. § 844(c)(1) of the twelve 1.3G fireworks he sold on June 27, 2007 to an undercover agent because these were the only fireworks related to his conviction on Count 5 of the Superseding Indictment. Defendant argued that the remaining fireworks are not subject to criminal forfeiture under § 844(c)(1) because they were not involved in the offense of conviction. Instead, Defendant suggested that he agreed to "abandon" his rights in the other 1.3G fireworks listed in the forfeiture count of the

Superseding Indictment. As a result, Defendant argued that this is a civil proceeding where the Court must determine which fireworks he agreed to abandon. The Court will address each of Defendant's arguments in turn, beginning with his most recent argument.

Defendant has waived the right to argue that this is a civil proceeding where the Court determines which fireworks he has agreed to "abandon." Parties are not permitted to raise new arguments or issues to the district court that were not presented to the magistrate. *Murr v. United States*, 200 F.3d 895, 902 n. 1 (6th Cir. 2000) (citing *United States v. Waters*, 158 F.3d 933, 936 (6th Cir. 1998)). This argument is directly relevant to Defendant's contention in his Motion for Sanctions that this is a civil proceeding, which was addressed by the Magistrate Judge. Defendant, however, failed to raise this argument at that time. Moreover, in his Motion for Sanctions, Defendant offered an entirely contradictory argument justifying his assertion that this is a civil proceeding. In the Motion, Defendant acknowledged that this is a criminal forfeiture proceeding governed by Federal Rule of Criminal Procedure 32.2, which adopts portions of the Federal Rules of Civil Procedure and uses the preponderance-of-the-evidence standard. For those reasons, Defendant argued this criminal forfeiture proceeding was actually a civil proceeding. Now, Defendant raises an "abandonment" argument in an attempt to show that this is not a criminal forfeiture proceeding at all. Because this argument is entirely inconsistent with his previous arguments, and was not presented to the Magistrate Judge, the Court finds that this argument is waived.

Despite the waiver, Defendant's argument is also misguided. In arguing that the government cannot seek criminal forfeiture of the majority of the fireworks, Defendant fails to recognize that the Court has yet to enter a Final Judgment of Forfeiture on the twelve

fireworks Defendant agrees are subject to criminal forfeiture. Instead, when the government tendered a proposed Preliminary Judgment of Forfeiture pursuant to Federal Rule of Criminal Procedure 32.2, Defendant objected that the tendered proposal was void for vagueness, unenforceable and usurped the judicial authority of the Court. As a result of that objection, the Court has yet to finally determine which fireworks are subject to criminal forfeiture pursuant to 18 U.S.C. § 844(c)(1) and Federal Rule of Criminal Procedure 32.2. That determination is a part of the current proceedings. Thus, this proceeding remains a criminal forfeiture proceeding.

A criminal forfeiture proceeding is a criminal proceeding. Criminal forfeiture is a bifurcated process. *See United States v. Liquidators of European Fed. Credit Bank*, 630 F.3d 1139, 1144-45 (9th Cir. 2011) (explaining the criminal forfeiture process). If a defendant is found guilty on a count supporting forfeiture during the first stage, the government may initiate the second stage by moving for entry of a preliminary order of forfeiture. *Id.*; Fed.R.Crim.P. 32.2(b). During that second stage, the court must determine whether the government has established the requisite nexus between the property and the offense. *Liquidators of European Fed. Credit Bank*, 630 F.3d at 1144-45. While Defendant is correct that the guilt phase of his proceeding is over, this criminal forfeiture proceeding is the second half of his criminal proceeding. It is not separate and apart as Defendant suggests, but instead a continuation of the criminal proceeding.

Moreover, Defendant is simply incorrect in suggesting that a criminal forfeiture proceeding shares so many similarities with a civil proceeding that it must be a civil proceeding subject to all of the Federal Rules of Civil Procedure. Foremost, criminal forfeiture proceedings are governed by Federal Rule of Criminal Procedure 32.2. That rule

adopts specific rules of the Federal Rules of Civil Procedure to govern particular portions of the forfeiture proceeding. *See, e.g.* Fed.R.Crim.P. 32.2(b)(6)© and (D). Rule 32.2 does not, however, adopt the civil rules in full. Secondly, the fact that criminal forfeiture proceedings use the preponderance of the evidence standard does not transform this proceeding into a civil proceeding. Although civil proceedings do use the preponderance of the evidence standard, so do some criminal proceedings. Criminal defendants in federal court are also held to that burden when they assert various defenses. *See, e.g. Dixon v. United States*, 548 U.S. 1, 8 (2006) (holding that jury instructions did not run afoul of the Due Process Clause when they placed the burden on the defendant to establish the existence of duress by a preponderance of the evidence). Accordingly, any similarities between the criminal forfeiture proceeding and a civil proceeding do not convert this into a "civil proceeding."

Defendant is also incorrect in arguing that this forfeiture action should be compared to an ancillary proceeding where the civil rules are used. A criminal forfeiture action against the criminal defendant and an ancillary proceeding initiated by an innocent third party are two distinct proceedings. As stated above, the forfeiture action against a criminal defendant follows the guilt phase of the defendant's trial. *See* Fed.R.Crim.P. 32.2(b)(1)(A). In that proceeding, the Court determines whether the defendant possesses property subject to forfeiture. *Id.* At sentencing, the forfeiture order becomes final as to the defendant. Fed.R.Crim.P. 32.2(b)(4)(A). In an ancillary proceeding, a third party files a petition asserting an interest in property to be forfeited. Fed.R.Crim.P. 32.2(c)(1). Rule 32.2 explicitly states that the ancillary proceeding is separate and apart from the defendant's forfeiture proceeding. *See* Fed.R.Crim.P. 32.2(c)(4).

Ancillary proceedings are also governed by rules that do not apply to the forfeiture proceeding against the defendant. Those rules are similar to, and in some instances adopt the Federal Rules of Civil Procedure. For example, in an ancillary proceeding, the Court may entertain motions to dismiss a third party's petition for lack of standing or failure to state a claim. Fed.R.Crim.P. 32.2(c)(1)(A). After disposing of any of those motions, the court may permit the parties to proceed with discovery under the Federal Rules of Civil Procedure and then move for summary judgment under Federal Rule of Civil Procedure 56. Fed.R.Crim.P. 32(c)(1)(B). The forfeiture proceedings against the criminal defendant do not follow these same rules. Therefore, the Court cannot assume this forfeiture proceeding is so similar to an ancillary proceeding that it must also be a "civil proceeding" governed by the federal rules. Simply put, the forfeiture proceeding is a part of a criminal defendant's criminal proceeding. Only the Federal Rules of Criminal Procedure apply unless those rules specifically state otherwise. For all of these reasons, the Court finds that this remains a criminal proceeding and will turn to the government's argument that inherent-power sanctions cannot be imposed in a criminal case.

### 2. The Court's inherent authority to impose monetary sanctions in a criminal case

Citing the Sixth Circuit's recent decision in *United States v. Aleo*, 681 F.3d 290 (6th Cir. 2012), the Government argues that a district court may not exercise its inherent powers to impose monetary sanctions in a criminal case. The Government did not raise this issue to the Magistrate Judge, but instead apparently conceded that the Court could use its inherent authority to impose monetary sanctions. Specifically, each time the Government briefed the issue of sanctions under the Court's inherent authority to the Magistrate Judge,

the Government first recognized the Court's inherent authority to impose sanctions but then argued there was no evidence of bad faith to justify sanctions under this power. (*See* Doc. # 134, at 9; Doc. # 183, at 10).

Defendant argues that the government has waived this argument because it was not presented to the Magistrate Judge. "Courts have held that while the Magistrate Judge Act, 28 U.S.C. § 631 *et seq.*, permits de novo review by the district court if timely objections are filed, absent compelling reason, it does not allow parties to raise at the district court stage new arguments or issues that were not presented to the magistrate." *Murr v. United States*, 200 F.3d 895, 902 n. 1 (6th Cir. 2000) (citing *United States v. Waters*, 158 F.3d 933, 936 (6th Cir. 1998)). Although this argument has been presented for the first time on objection to the Magistrate Judge's R&R, the Court finds compelling reason to consider the argument. The government's argument is based solely on *Aleo*, which was decided on May 15, 2012, just three days before the Magistrate Judge filed her R&R. Because of the recency of the *Aleo* decision, the government never had the opportunity to brief this issue. Therefore, the Court finds that the government did not waive this argument.[10]

Despite the Government's failure to raise this issue any earlier, the Government misstates the Sixth Circuit's holding in *Aleo*. In *Aleo*, the Sixth Circuit addressed the propriety of a $2,000 sanction imposed on a criminal defendant's trial counsel. *Aleo*, 681 F.3d at 303. The district court sanctioned the attorney under its inherent authority to sanction "bad-faith conduct in litigation," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 42 (1991), because the court concluded the attorney "filed a meritless motion in a bad-faith effort to

---

[10] This finding is of little consequence to Defendant because the Court ultimately finds the argument lacks merit.

intimidate a victim who wished to speak during [the defendant's] hearing." *Aleo*, 681 F.3d at 303. The Sixth Circuit reviewed the attorney's conduct and concluded that the attorney's motion was in error, but not filed in bad faith. *Id.* at 306. Therefore, the *Aleo* Court held that the district court abused its discretion in imposing sanctions under its inherent authority to sanction bad-faith conduct. *Id.*

The majority opinion, however, did not hold that a trial court may *never* use its inherent authority to impose monetary sanctions in a criminal case. Instead, the majority recognized the district court's "inherent power to sanction when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons,' or when the conduct was 'tantamount to bad faith.'" *Id.* at 305 (quoting *Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011)). Only in a footnote did the majority cast any doubt on whether sanctions are permitted in a criminal case under a district court's inherent authority. In footnote 13, the majority stated:

> it may be questionable whether the inherent authority to sanction even exists in a criminal case such as this one. An argument can be made that Federal Rule of Criminal Procedure 42, covering criminal contempt, is the sole mechanism for punishing bad-faith conduct in criminal cases. *We do not need to reach this issue* because [the attorney's] conduct fails to merit sanctions under either the court's inherent authority or Rule 42.

*Id.* at 305, n. 13 (emphasis added).

Without acknowledging the majority's holding, the government instead relies solely on Judge Sutton's concurrence. According to the government, "Judge Sutton, concurring, rejected the notion that a judge may use inherent power to end-run a cabined power in criminal cases, i.e. the power to hold a criminal litigant in contempt under 18 U.S.C. § 401." (Doc. # 193, at 7). Although Judge Sutton expressed strong reservations about the district

court's authority to impose sanctions in a criminal case under its inherent powers, the government entirely overstates Judge Sutton's concurrence.

In his concurrence, Judge Sutton opened by stating that he wrote "separately to express *skepticism* about a lower federal court's power ever to use inherent authority, as opposed to the contempt power established by statute (18 U.S.C. § 401) and implemented by rule (Fed.R.Crim.P. 42), *to punish a defense attorney in a criminal case for filing a frivolous motion.*" *Aleo*, 681 F.3d at 306 (Sutton, J., concurring) (emphasis added). As this introductory sentence makes clear, Judge Sutton did not write to cast doubt on a district court's authority to impose sanctions in criminal cases generally. Instead, Judge Sutton's concurrence more specifically addressed the district court's authority to impose sanctions on an attorney for filing a frivolous motion. This focus becomes more clear throughout Judge Sutton's concurrence.

Judge Sutton recognized that a district court possesses inherent powers that are necessary for it to exercise all of other powers, stating:

> [w]hen the Constitution established a Supreme Court and Congress later created the lower courts, those actions came with an implied delegation to allow the courts to formulate procedures for their cases, including a mechanism to control the lawyers before them.

*Id.* However, because the lower federal courts were created by acts of Congress, Judge Sutton also stated that the legislature may limit the lower courts' inherent powers. *Id.* at 307. Where the legislature has not provided a means for the court to control litigants, and thus left a "gap," Judge Sutton agrees that the court may use its inherent powers to fill that gap. *Id.* However, in the criminal context, Judge Sutton "lean[ed] toward the . . . view" that Congress and the Rule Makers left the court with only one power to sanction in a criminal

case – the contempt power authorized by 18 U.S.C. § 401 and Criminal Rule 42.

Judge Sutton's arguments in support of this "view" reveal his belief that Congress and the Rule Makers did not want to give district courts the authority to sanction advocacy. He stated that arguments on behalf of criminal defendants, which would not be tolerated if advanced in criminal proceedings, are tolerated to ensure defendants receive zealous advocacy. Congress intentionally omitted a Civil Rule 11-type sanction from the Criminal Rules to avoid "the risk [that] sanctions could chill legitimate, indeed constitutionally required, advocacy." *Id.* Otherwise defense attorneys might be sanctioned for "a frivolous plea of not guilty" or "a frivolous refusal to admit elements of a charged offense." *Id.*[11]

The focus of Judge Sutton's concurrence becomes even more apparent when he distinguishes cases from other courts of appeals where they approved the use of inherent-power sanctions in criminal cases. He stated, "the government cites no case, nor have we found one, in which a court of appeals affirmed a district court's use of its inherent power to impose sanctions *on an attorney for filing a frivolous motion.*" *Id.* at 311 (emphasis added). Instead, according to Judge Sutton, those courts addressed sanctioning "attorney misconduct *unrelated* to advancing legal arguments." *Id.* (emphasis added). After considering the omission of a Civil Rule 11-type sanction from the Criminal Rules, and the cases he distinguished, Judge Sutton concluded that "if courts wish to punish criminal defense attorneys for *improper filings*, they should satisfy the strictures of the contempt power, not rework this balance however they see fit under their inherent power." *Id.* (emphasis added). This conclusion makes clear that Judge Sutton offered no opinion on

---

[11] Judge Sutton also expressed concerns about a district court's authority to impose sanctions on the government, implicating sovereign immunity issues. This concern will be addressed in the following section.

a Court imposing monetary sanctions against an attorney or party in a criminal case for misconduct unrelated to advancing legal arguments.

Moreover, Judge Sutton did not flatly reject the notion that a district court should ever be able to impose monetary sanctions under its inherent authority in a criminal case. Instead, he specifically stated:

> [r]ather than take the position that lower federal courts may *never* invoke an inherent sanctioning power when it comes to frivolous filings in criminal cases, the better part of valor is to suggest that a district court tempted to invoke its inherent powers ought to resist the urge *unless* it can satisfactorily address these considerations:
>
> 1. Is there a relevant Criminal Rule? If so, why not invoke it?
>
> 2. Is there a Civil Rule covering the same conduct? If so, is it possible the drafters of the Criminal rules opted not to impose similar sanctions in criminal cases because the Civil Rule does not lend itself to the criminal context?
>
> 3. If neither the Criminal Rules nor the Civil Rules speak to the issue, should a court impose such sanctions on a case-by-case basis or urge the Advisory Committee on the Federal Rules of Criminal Procedure to invoke the deliberative and inclusive Rules Enabling Act process to consider the adoption of a new Rule?
>
> 4. If none of this gives a court pause and if imposing a criminal sanction for a frivolous filing remains consistent with the restraint and direction appropriate for any exercise of inherent judicial powers, . . . , this is a rare case.

*Id.*

Here, the Magistrate Judge has recommended sanctions against the government for conduct that was not considered by Judge Sutton or the majority in *Aleo*. In fact, the potentially sanctionable conduct here is exactly the type of conduct that Judge Sutton acknowledges other courts have permissibly sanctioned. In her R&R, the Magistrate Judge

found that "the Government's conduct in failing to provide a <u>complete</u> list of the 1.4G fireworks by the deadline ordered by the District Judge (*see* Doc. 44, at 3) and in failing to return Defendant's lawful items as ordered by the District Judge" warranted sanctions. (Doc. # 186, at 22). This conduct is entirely unrelated to advancing legal arguments, and is therefore not the type of conduct that Judge Sutton expressed reservations on whether it should be sanctioned.

Instead, the government's conduct is exactly the type that other courts of appeals have recognized may be sanctioned under a district court's inherent authority. For example, in *United States v. Wallace*, 964 F.2d 1214 (D.C. Cir. 1992), the Court of Appeals for the District of Columbia considered the propriety of sanctions imposed against a criminal defense attorney for failing to subpoena two witnesses, which resulted in the witnesses not appearing for trial on the date they were scheduled to testify. *Id.* at 1216. The *Wallace* Court recognized that the trial court had the inherent power to sanction the defense attorney for bad-faith conduct, but ultimately held that the attorney's conduct was not in bad faith. *Id.* at 1219.

In *Bills v. United States*, 11 F. App'x 342 (4th Cir. 2001), a criminal defense attorney appealed the district court's imposition of sanctions against him under the court's inherent powers for failing to appear at his client's sentencing hearing. Pursuant to *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1992), the Fourth Circuit recognized that district courts have the inherent authority to discipline attorneys who appear before them. *Bills*, 11 F. App'x at 342. The *Bills* Court then held that "the district court was within its discretion to impose a fine and to preclude [the attorney] from appearing before it again" under its inherent authority. *Id.*

As the *Bills* and *Wallace* cases make clear, a district court may exercise its inherent authority to impose monetary sanctions against parties for conduct unrelated to advancing legal arguments. Imposing sanctions for non-advocacy related conduct does not run the risk of "chilling" advocacy as Judge Sutton feared, but only serves to "impose silence, respect, and decorum" and "submission to [the court's] lawful mandates." *Anderson v. Dunn*, 6 Wheat. 204, 227 (1821). Here, the Magistrate Judge recommends the Court find that the government entirely disregarded Court orders and made bad-faith representations about the condition of the fireworks. Sanctioning this conduct would not "chill" advocacy.

. Accordingly, the government's conduct in this criminal case is the type that may be sanctioned in a criminal case under the court's inherent authority. However, two additional objections posed by the government must be entertained before sanctions may be imposed: (1) whether the government is otherwise protected by sovereign immunity from sanctions under the Court's inherent authority; and (2) whether the Magistrate Judge erred in her conclusion that the government acted in bad faith.

### 3. Sovereign immunity bars sanctions against the Government under the Court's inherent authority

For the first time,[12] the Government argues that sovereign immunity bars the Court from imposing sanctions under its inherent authority against the United States. The Sixth

---

[12] Although this argument is being raised for the first time on objections from the Magistrate Judge's R&R, the government has not waived this argument. "Sovereign immunity advances a jurisdictional bar which a party may raise *at any time*, even on appeal, and which the court may raise sue sponte." *United States v. Bein*, 214 F.3d 408, 412 (3d Cir. 2000) (emphasis added); *see also In re Nordic Village, Inc.*, 915 F.2d 1049, 1056 n.1 (6th Cir. 1049) (Kennedy, J., dissenting) ("The government has not waived its sovereign immunity argument by failing to raise it below since questions of sovereign immunity are jurisdictional and may be raised at any time.");*United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 514 (1940) ("Consent alone gives jurisdiction to adjudicate against a sovereign. Absent that consent, the attempted exercise of judicial power is void."). Thus, the Government may assert a sovereign immunity defense at this juncture, and the Court must consider whether sovereign immunity bars this Court from imposing sanctions against the Government under its inherent authority.

Circuit has not directly addressed this issue. The parties, however, have cited cases from three circuits that have reached opposite conclusions. The Government cites the First Circuit's decision in *United States v. Horn*, 29 F.3d 754 (1st Cir. 1994), for the proposition that the district court's inherent powers do not overcome sovereign immunity in a criminal case. Defendant, on the other hand, cites the Fifth Circuit's decision in *F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566, 595 (5th Cir. 2008), for the proposition that "sovereign immunity falls away when a court acts under its sanctioning powers." Defendant also cites the Ninth Circuit's decision in *United States v. Woodley*, 9 F.3d 774 (9th Cir. 1993) for the proposition that Federal Rule of Civil Procedure 11(c) expressly waives the government's immunity to sanctions under the Court's inherent authority.

In *United States v. Horn*, the district court imposed monetary sanctions against the government for "unpardonable misconduct committed by a federal prosecutor." *Horn*, 29 F.3d at 759. On appeal, the government contended that the sanctions were prohibited by principles of sovereign immunity. *Id.* Therefore, the First Circuit addressed the following question: "Do principles of sovereign immunity bar a federal district court, exercising its supervisory power, from assessing attorneys' fees and costs against the federal government in a criminal case?" *Horn*, 29 F.3d 754, 757 (1st Cir. 1994). That is exactly the issue presented here.

The *Horn* Court stated that "supervisory power is sometimes understood to derive from the Constitution, either as incidental to the Article III grant of judicial power, . . . , or as implicit in the separation of powers." *Id.* at 759 (internal citations omitted). It has been recognized by the Supreme Court as properly used "to implement a remedy for violation of recognized rights, to preserve judicial integrity . . . and . . . as a remedy designed to deter

illegal conduct." *Id.* at 760 (quoting *United States v. Hastings*, 461 U.S. 499, 505 (1983)). However, according to the *Horn* Court, it may only be used in criminal cases "when confronted with extreme misconduct and prejudice," and only when there is no effective alternative provided by rule, statute or constitutional clause.

After considering the purpose and scope of the district court's supervisory or inherent powers, the *Horn* Court considered the "unavoidable tension" between the doctrines of sovereign immunity and supervisory powers. *Id.* at 763-64. It stated that "sovereign immunity ordinarily will trump supervisory power in a head-to-head confrontation." *Id.* After all, "if Congress has not waived the sovereign's immunity in a given context, the courts are obliged to honor that immunity." *Id.*

The court then considered three potential "avenues" to "tip-toe" around the force of sovereign immunity. *Id.* at 764. First, the court found there has been no waiver of sovereign immunity in this context because Congress has not passed a statute or rule lifting immunity. *Id.* Second, the court concluded that the judiciary does not possess the "naked power to override sovereign immunity" because it is Congress, not the courts, that are authorized to waive sovereign immunity. *Id.* Finally, the *Horn* court found that there is no other reason why the federal government's sovereign immunity does not extend to monetary sanctions levied under a court's supervisory power. *Id.*

In reaching this final conclusion, the *Horn* Court considered whether the district courts must be able to use monetary sanctions against the executive branch as a necessary function of its Article III powers. Specifically, the court considered whether "stripping away the power to assess monetary penalties in a criminal case would leave courts defenseless against litigation abuses committed by the government – which is, after

all, a party to every criminal system – and thereby offend the separation of powers." *Id.* at 766. The court ultimately concluded that district courts would not be left to the mercy of "cantankerous prosecutors" if they were unable to impose monetary sanctions against the government. The district court might impose other sanctions, including: sanctioning the government agent, suppressing evidence, ordering the attorney to attend ethics training, dispatching the attorney to the Justice Department's internal disciplinary office, or publically reprimanding the Justice Department itself. In the end, the *Horn* Court found that sovereign immunity trumps the district court's authority to impose monetary sanctions against the government, in part because the court may control the parties before it by imposing other non-monetary sanctions.

Other courts have reached the same conclusion in more conclusory fashion. *See Tippett v. United States*, 98 Fed. Cl. 171, 181 (Fed. Cl. 2011) ("[T]he court cannot consider its inherent powers alone to be sufficient to overcome the sovereign immunity protecting the United States from claims for monetary contempt sanctions or litigations expenses."); *Alexander v. F.B.I.*, 541 F. Supp.2d 274, 301 (D.D.C. 1994) (holding that sovereign immunity bars the imposition of sanctions against the Government under the court's inherent authority). Moreover, some district courts, including one in this Circuit, have adopted the First Circuit's holding in *Horn* because their respective Circuit has not addressed this issue. *See Hoste v. Shanty Creek Management, Inc.*, 246 F. Supp. 2d 784, 790 (W.D. Mich. 2002); *United States v. Sommers*, 864 F. Supp. 902, 904 (S.D. Iowa 1994); *United States v. Stein*, 435 F. Supp. 2d 330, 375 (S.D.N.Y. 2006).

Only two circuits appear to allow sanctions against the Government under a court's inherent authority. In *F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566 (5th Cir. 2008), the Fifth

43

Circuit held in conclusory fashion that

> [t]he question of the scope of sovereign immunity falls away when a court acts under its sanctioning powers. The threshold question in a sanctions case is whether the court has the power to sanction a party for frustrating its Article III functions. The government, as a party to a lawsuit, is subject to the same ethical and procedural rules as a private litigant, and risks the same sanctions if it fails to abide by these rules.

*Id.* at 595. Thus, according to the Fifth Circuit, the court may always impose monetary sanctions against the government when it frustrates the court's Article III functions.[13]

In *United States v. Woodley*, 9 F.3d 774 (9th Cir. 1993), the Ninth Circuit has also suggested that a district court may be able to impose monetary sanctions against the government in limited circumstances. At oral argument, both parties argued that *Woodley* supported their respective positions, but each overstated the Ninth Circuit's holding. In *Woodley*, the Ninth Circuit stated that "[s]overeign immunity does not bar a court from imposing monetary sanctions under an exercise of its supervisory powers." *Id.* at 782. However, because of separation-of-powers principles, the *Woodley* Court held that a court may only impose sanctions under its inherent authority against the government where there has been a violation a statute, constitutional or other right. *Id.* Additionally, the court held that inherent powers may not be used to sanction a party for violating a statute or rule that otherwise contains its own specific remedies.[14] *Id.* ("The fact that Rule 16 allots specific

---

[13] A 2011 decision from the Eastern District of Louisiana casts doubt on whether the Fifth Circuit actually allows the court to exercise its inherent supervisory power as a source of authority for imposing a financial cost on the government. In *United States v. St. Pierre*, No. 09-374, 2011 WL 2199375, at *2 (E.D. La. June 6, 2011), the court stated that the Fifth Circuit has not specifically addressed the questions presented in *Horn*, and held that there has been no specific waiver of sovereign immunity allowing the court to shift fees onto the government. The *St. Pierre* Court did not cite or otherwise acknowledge the *Maxxam* decision.

[14] Defendant argues that *Woodley* recognizes the Court's authority to sanction the government under Federal Rule of Civil Procedure 11. As previously stated, the Court finds this is a criminal proceeding governed by the Federal Rules of Criminal Procedure and, thus, Rule 11 is inapplicable here. Even if Rule

remedies for its violation eliminates any justification for an exercise of supervisory power to create any other remedy for it." (internal quotations omitted)).

With this clear split of authority in mind, the Court is left to consider the state of the law in the Sixth Circuit. As previously stated, the Sixth Circuit has not directly addressed this issue. However, there are indications that the Sixth Circuit would follow the First Circuit's opinion in *Horn*, holding that sovereign immunity bars sanctions under a court's inherent authority. In *Aleo*, Judge Sutton posed the following rhetorical question suggesting that sovereign immunity might bar sanctions against the government: "[w]hat if a court imposed monetary sanctions against the government, implicating its sovereign immunity and potentially amounting to sanctions greater than Congress allows for bad-faith prosecutions?" *Aleo*, 681 F.3d at 308. As a further indication of his position, Judge Sutton followed this rhetorical question with a citation to *Horn*, suggesting he might follow the First Circuit's decision.

Moreover, another court within this circuit has applied *Horn* in concluding that sovereign immunity bars a court from imposing sanctions on the government. In *Hoste v. Shanty Creek Management, Inc.*, 246 F. Supp. 2d 784, 790 (W.D. Mich. 2002), a case with a particularly unusual procedural posture, the Western District of Michigan reviewed the propriety of a state court's "cost assessment" on the federal government. Citing *Horn*, the court held that "the monetary sanction . . . is invalid in any event, insofar as sovereign immunity saves the federal government from a court-imposed monetary assessment not

_____

11 were applicable to this case and the Court followed *Woodley*, the Court could not sanction the government under its inherent powers for violating Rule 11(b). Rule 11(c) contains its own specific remedies for violations of Rule 11(b). Thus, according to *Woodley*, the Court cannot use its inherent powers to sanction the government for violating Rule 11.

expressly authorized by applicable federal law." *Id.*

The Court finds that the First Circuit's decision in *Horn* most persuasive with regard to sovereign immunity. As the Supreme Court has repeatedly held, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies" from monetary damages. *F.D.I.C. v. Myer*, 510 U.S. 471, 475 (1994). Congress is the only branch of government with the authority to waive sovereign immunity. *See Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999). "A waiver of sovereign immunity is to be strictly construed, in terms of its scope, in favor of the sovereign." *Id.* Neither the Fifth Circuit nor the Ninth Circuit addressed this basic principle of sovereign immunity. The First Circuit, however, did address waiver and properly concluded that Congress has not unequivocally expressed its intention to waive the government's immunity to sanctions imposed under the district court's inherent authority. *Horn*, 29 F.3d at 764.

Contrary to this holding, the Defendant argues that the government has waived its sovereign immunity. Defendant points to the sanctioning power in Federal Rule of Civil Procedure 11(c) and the Court's contempt power in 18 U.S.C. § 401, and argues the government has waived its sovereign immunity in this rule and statute. However, Defendant's argument is misguided. The Court may only exercise its inherent authority "when there is no effective alternative provided by rule, statute, or constitutional clause." *Horn*, 29 F.3d at 760 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50-51 (1991)). Defendant has cited a rule and statute that gives the Court authority to sanction parties separate and apart from the Court's inherent authority. If Congress has waived the government's sovereign immunity to sanctions under either of these powers, that waiver says nothing about whether Congress has waived sovereign immunity to sanctions under

the Court's inherent authority. Therefore, Defendant has failed to establish that Congress has waived sovereign immunity in this context, and *Horn*'s discussion on the absence of a waiver remains persuasive.

The *Horn* Court also properly considered the "unavoidable tension" between the doctrines of sovereign immunity and inherent powers in its separation of powers analysis, a point not addressed by *Maxxam* or *Woodley*. Without a doubt, courts must have authority to control the parties before it. *Horn* recognizes this authority. However, *Horn* strikes a fine balance between the court's ability to control parties before it and the executive branch's shield of sovereign immunity. *Horn* found that the court can adequately control parties before it through various non-monetary sanctions. *Id.* at 766-67. *Maxxam*, on the other hand, stated in conclusory fashion that "sovereign immunity falls away" when the court exercises its inherent authority against the government, without giving any consideration to sovereign immunity principles. *Maxxam*, 523 F.3d at 596. The doctrine of sovereign immunity has such strong force that it deserves more consideration than that given by the Fifth Circuit in *Maxxam*. Accordingly, the Court concludes that sovereign immunity bars it from imposing monetary sanctions against the government under its inherent authority.

### 4. The government has not waived its sovereign immunity with respect to contempt sanctions under 18 U.S.C. § 401

Defendant also argues that the Court may sanction the government using its civil contempt power. Congress granted federal courts with contempt power in 18 U.S.C. § 401. The statute states:

> A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and

none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

18 U.S.C. § 401.

This statute permits courts to impose civil and criminal sanctions on parties who fail to comply with a lawful, specific court order. *Downey v. Clauder*, 30 F.3d 681, 685 (6th Cir. 1994). The same conduct can give rise to both civil and criminal contempt judgments. *Id.* The distinction between each form of contempt turns on "the character and purpose of the sanction involved." *Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 827 (2011). Civil contempt sanctions are either "those penalties designed to compel future compliance with a court order" or to compensate the complainant. *Id.* Criminal sanctions, on the other hand, are imposed as punitive measures to "vindicate the authority of the court." *Id.*

Defendant argues that the government's failure to comply with this Court's Order and in failing to return Defendant's lawful items constitute contemptuous conduct. Thus, Defendant suggests the Court should impose compensatory civil contempt sanctions against the government. However, sovereign immunity bars such sanctions.

Although 18 U.S.C. § 401 confers broad powers on the court, it does not qualify as a waiver of sovereign immunity. *Coleman v. Espy*, 986 F.2d 1184, 1191 (8th Cir. 1993); *Barry v. Bowen*, 884 F.2d 442, 444 (9th Cir. 1989). The statute does not contain explicit, unequivocal language allowing the government to be sued. *Coleman*, 986 F.2d at 1191;

48

*Barry*, 884 F.2d at 444; *Alexander v. F.B.I.*, 541 F.Supp.2d 274, 300 (D.D.C. 2008).  As the Tenth Circuit held in *In re Graham*, provisions authorizing sanctions generally "do[ ] not automatically waive sovereign immunity, and thus  do[ ] not apply, without more, to fee awards against the government.  *In re Graham*, 981 F.2d 1135, 1139-40 (10th Cir. 1992). Accordingly, the Court cannot sanction the government or the ATF under its civil contempt power.[15]

Defendant cites multiple cases where courts have imposed monetary sanctions against government *officials* in their individual capacity under their civil contempt power. *See, e.g. Nelson v. Steiner*, 279 F.2d 944 (7th Cir. 1960); *Norman Bridge Drug Company v. Banner*, 529 F.2d 822 (5th Cir. 1976); *Hinton v. Sullivan*, 737 F. Supp. 232 (S.D.N.Y. 1990).  However, these cases say nothing about the Court's authority to sanction the federal government or a federal government agency under § 401.

When the Court raised this issue with defense counsel at oral argument, counsel responded that the Court should hold the Director of the ATF in contempt.  However, this argument is misguided for several reasons.  Under § 401, the Court may sanction "any person in its presence or so near thereto" for misbehavior that obstructs the administration of justice.  There have been no allegations that the Director of the ATF participated in, was aware of, or acquiesced in any of the alleged contemptuous conduct.  Defendant has not offered any precedent for the proposition that an individual may be sanctioned under a

---

[15]  The District Court for the District of Columbia has held that courts may impose *coercive* civil contempt fines on a federal government agency.  *See American Rivers v. U.S. Army Corps of Engineers*, 274 F.Supp.2d 62, 69 (D.D.C. 2003); *Armstrong v. Executive Office of the President*, 821 F.Supp. 761, 773 (D.D.C. 1993), *rev'd on other grounds* 1 F.3d 1274 (D.C. Cir. 1993).  However, the Court is not being asked to use its coercive civil contempt power in this case.  The Court is not attempting to force future compliance with a court order, but instead force the government to compensate Defendant for the economic hardship the government has caused.

respondeat superior theory for the actions of his or her subordinates. Instead, giving § 401 its plain meaning, the Court can only sanction parties for their own misbehavior. And even if the Director of the ATF engaged in sanctionable conduct, sovereign immunity would bar sanctions against him in his official capacity. *See Ball v. Union Carbide Corp.*, 385 F.3d 713, 729 (6th Cir. 2004) (stating that government officials are protected by sovereign immunity when sued in their official capacity); *Hampton v. Marion*, 98 F. App'x 410, 412 (6th Cir. 2004) (same). Finally, the Court is not inclined to sanction the Director of the ATF in his individual capacity, forcing the Director to personally pay for sanctions. Simply put, sovereign immunity bars sanctions under § 401 against the government, the ATF, or the Director of the ATF in his official capacity.

### 5. The government acted in bad-faith conduct

Although the Magistrate Judge's recommendation on Defendant's Motion for Sanctions cannot be adopted because sanctions are barred by sovereign immunity, the Magistrate Judge appropriately concluded the government engaged in bad-faith conduct that would justify sanctions. According to the Magistrate Judge, sanctions are warranted for two reasons. First, the government failed to fully comply with this Court's Order to "[c]omplete its testing, including the segregation of 1.4G and 1.3G fireworks for which it seeks forfeiture," "provide to the Defendant a list of legal 1.4G fireworks," and "provide Defendant with a timetable for the return of the legal 1.4G fireworks." (Doc. # 44, at 3-4). Second, the government repeatedly misstated the condition of fireworks in its refusal to return what were later found to be legal, undamaged fireworks. The government has objected to both of these findings.

The Magistrate Judge accurately concluded that the government failed to comply with this Court's February 19, 2009 Order requiring the government to complete its testing and provide Defendant with a final list of 1.4G fireworks, as well as a timetable for the return of the legal fireworks no later than March 11, 2009. On March 11, 2009, the AUSA sent Defendant a letter stating that "[i]t is the opinion of the ATF that all the fireworks that have been stored at Heritage Disposal and Storage – including the consumer fireworks – are unfit to be transported in, or otherwise introduced back into, interstate commerce. Therefore, ATF has agreed to compensate your client for the wholesale price of those items that should be returned to him." Enclosed with the letter was a list of fireworks determined to be 1.4G fireworks, which appeared to be in compliance with the Court's February 19, 2009 Order.

However, the list enclosed with the March 11, 2009 letter was not actually a final list. Nearly two and a half years later, the government produced a new list of 1.4G fireworks at the evidentiary hearing. The government argues that "the later consumer fireworks list contains only approximately twenty *items* not included on the original list provided to [Defendant]," and thus any differences are *de minimis.* (Doc. # 193, at 9-10 n. 6) (emphasis added). However, the government grossly understates the discrepancies between the list. The later list included approximately twenty *types* of fireworks that were not included in the March 11, 2009 list. This resulted in approximately 30,000 fireworks not being identified on the original list.

The government's failure to comply with the Court's Order does not stop at its failure to produce a final list. The Court also ordered the government to complete its testing, including the segregation of 1.4G and 1.3G fireworks not later than March 11, 2009.

However, the government failed to comply with that order as well. As the Magistrate Judge noted, additional reports of testing and segregation were not rendered until March 13, 2009 and March 17, 2009. (Doc. # 181, Gov't Exs. 4, 10). The March 13, 2009 was not even a final report, but instead labeled a "Draft," (Doc. # 181, Gov't Ex. 4) that had yet to be "reviewed and gone over a few times," as Agent Chard admitted during the evidentiary hearing. (Doc. # 189, at 45). Additionally, as late as October 2009, fireworks were still being counted, weighed and photographed.

The failure to complete testing by March 11, 2009 makes the failure to produce a final list even more egregious. The government knew it had not completed testing, but never brought it to the attention of the Court or Defendant that its classification of the fireworks was incomplete. Nor did the government request an extension of time to finish testing and provide an accurate list. Instead, it implicitly represented on March 11, 2009 that testing was complete and it had produced a final, accurate list of 1.4G fireworks.

The Court also ordered that the government provide Defendant with a timetable for return of the 1.4G fireworks no later than March 11, 2009. Instead of providing a timetable, the government represented that all of the fireworks were unfit to be transported and the government would compensate Defendant for the value of the fireworks. However, as will be explained below, the government proved that only a small amount of the fireworks were actually damaged and unfit for transportation. Thus, the Magistrate Judge concluded that this "unilateral decision that all of the fireworks were unfit to return and consequently that no timetable would be provided does not amount to a good faith compliance with the Court's Order." (Doc. # 186, at 25).

The government objects to the Magistrate Judge's conclusion that it made a unilateral decision that fireworks were unfit for distribution. The government suggests that it relied on a "Report on Manipulation of Material" produced by Mark Vess, the Vice-President of the explosive/disposal contractor in Nebraska to which the fireworks were sent for storage, in concluding the fireworks were unfit to return. Specifically, Mr. Vess's report concluded that as a function of safety, 391,067 pounds of materials derived from the Conex containers pose a significant concern as to whether they will function properly. However, the government's reliance on Mr. Vess's report is misplaced. Even if Mr. Vess was concerned about the condition of the fireworks stored in the Conex containers, his concerns offer no support for the government's contention that the fireworks stored in the bunkers were also unfit to return.

The government also objects to the Magistrate Judge's conclusion that very few of the fireworks were actually damaged, showing that the government acted in bad faith in suggesting otherwise and refusing to return legal, undamaged fireworks. Specifically, the Magistrate Judge found "the evidence established that only 204 boxes of fireworks were water-damaged; all of which were originally stored in the conex containers and all of which were classified as red." (Doc. # 186, p. 26). The government objects that in reaching this conclusion, the Magistrate Judge ignored Bradford's and Campbell's affidavits "that more than those visibly damaged fireworks were unfit to be sold to consumers." According to the government, "the issue was not the safety of the fireworks that were visibly water damaged, . . . , but the similarly-stored fireworks that could have been exposed to conditions that made them unsafe." (Doc. # 193, at. 13). However, neither affidavit supports the government's argument.

Campbell's affidavit stated that he:

> observed the *majority* of the 1.3G and 1.4G firework-type devices . . . were exposed to a high degree of moisture, extreme fluctuating temperatures and excessive rodent infestation. As a result, *a majority* of the 1.3G and 1.4G firework-type devices *showed signs of deterioration* that caused me concern regarding the functionality of the fireworks as designed.

(Doc. # 142-3, at 2) (emphasis added). However, after limiting his concerns to the majority of fireworks that showed deterioration, Campbell concluded that:

> . . . the deterioration of *all* fireworks seized from Droganes . . . poses a substantial product liability for their use as originally designed and should not be offered for release to the public . . . *All* explosive materials seized from Droganes should be authorized for immediate destruction.

(Doc. # 142-3, at 4) (emphasis added). Campbell did not suggest, as the government now argues, that his observations of the majority of fireworks caused concern for all fireworks. Instead, he expressed concern that the majority of the fireworks showed visible damage and then stated in conclusory fashion that *all* fireworks had deteriorated and should be destroyed. His affidavit provides no support to the contention that all fireworks were unfit to be returned based on his observations of the majority of the fireworks.

Moreover, Campbell's statement that the majority of the fireworks were in a visibly deteriorated condition is not well taken. Only 204 boxes in seven storage bunkers showed visible signs of water damage; none of the boxes in the remaining twenty-eight bunkers showed similar signs of damage. Similarly, although several boxes showed signs of rodent infestation, there was no proof that any of the fireworks inside the boxes had been damaged by rodents. Thus, Campbell grossly overstated that the majority of the fireworks were visibly damaged. Accordingly, the Magistrate Judge did not err in giving his affidavit little credit.

Bradford's affidavit nearly mirrors Campbell's and, thus, was also properly given little consideration. Like Campbell, Bradford stated that "the *majority* of the . . . firework-type devices . . . were exposed to a high degree of moisture and fluctuating temperatures and excessive rodent infestation. As a result, the majority of the explosive materials *showed signs of deterioration* that raised questions regarding the functionality as designed." However, as stated above, the majority of the fireworks did not show signs of deterioration, and thus Bradford's ultimate opinion was properly given little weight.

The government makes one final argument objecting to the Magistrate Judge's conclusion that the government acted in bad faith by "refusing to return the fireworks after it completed its testing and classification and its conduct in misrepresenting the condition of the fireworks." The government suggests it refused to return the fireworks for a period of time because it contemplated paying Defendant for all 1.4G fireworks that were damaged and unfit to return. According to the government, this original proposal was made in good faith. However, the promise was not fulfilled because the government later determined that it was not liable for any goods damaged while in its custody under the "detention of goods" exception to the Federal Torts Claims Act. Thus, the government suggests that any protracted refusal to return the goods was ultimately made in good faith while the government was attempting to reach an "extrajudicial" resolution of the matter.

The government's argument confuses the issue. The Magistrate Judge did not recommend sanctions because the government reneged on its promise to pay Defendant for the 1.4G fireworks. Instead, the Magistrate Judge recommended sanctions based on the ATF's original representation that *all* fireworks were unfit to be returned, and its refusal to return fireworks it classified as consumer grade because the fireworks were allegedly

damaged. As the Magistrate Judge properly concluded, only 204 boxes were actually damaged, and the fireworks within those boxes were all 1.3G fireworks subject to forfeiture.

For all of these reasons, the government's objections to the Magistrate Judge's conclusion that the government acted in bad faith are without merit. However, this finding has little consequence because the Court's authority to impose sanctions is trumped by the government's sovereign immunity.

### III. CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

(1)     The United States' objections to the Report and Recommendation (Doc. # 193) are hereby **SUSTAINED IN PART** to the extent the government argues that sovereign immunity bars the Court from imposing sanctions under its inherent powers. The United States' remaining objections are hereby **OVERRULED**;

(2)     The Defendant's objections to the Report and Recommendation (Doc. # 192) are hereby **OVERRULED**;

(3)     The Magistrate Judge's Findings of Fact are hereby **ADOPTED** by the Court, while the Magistrate Judge's Conclusions of Law are hereby **ADOPTED IN PART** and **REJECTED IN PART**;

(4)     Defendant's Objections to the United States' proposed Preliminary Judgment of Forfeiture (Doc. # 103) are hereby **SUSTAINED IN PART**. The United States shall tender an amended proposed Preliminary Judgment of Forfeiture **on or before September 7, 2012**, that identifies the fireworks on the Red List (Doc. # 181, Gov't Ex. 11) and the 1.3G fireworks listed on the amended Orange List (Doc. # 199-3) as being subject to

forfeiture.

(5)     The fireworks designated as 1.4G fireworks on the Green List (Doc. # 181, Gov't Ex. 12) and the amended Orange List (Doc. # 199-3) shall be returned to Defendant, at the government's expense, **within thirty (30) days of this Order**.   Defendant's remaining objections to the United States' proposed Preliminary Judgment of Forfeiture are hereby **OVERRULED**.

(6)     Defendant's Motion for Sanctions (Doc. # 119) is hereby **DENIED**; and

(7)     The United States' Motion for Destruction of Property (Doc. # 142) is hereby **DENIED AS MOOT**.

This 21st day of August, 2012.



Signed By:

*David L. Bunning*

United States District Judge